Opinion filed February 16,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-10-00043-CR 

                                                    __________

 

                          NORMAN
EARL HORTON, JR., Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 35th District Court

                                                            Brown
County, Texas

                                                   Trial
Court Cause No. CR17205

 



 

                                            M
E M O R A N D U M   O P I N I O N

            Norman
Earl Horton, Jr., was indicted in three separate counts for aggravated sexual
assault of a child by penetration of her sexual organ.  The victim, T.C., was
the stepdaughter of appellant.  She was younger than fourteen years of age on
all three occasions.  For the aggravated sexual assault alleged in Count I of
the indictment, the jury found appellant guilty and assessed punishment at confinement
in the Institutional Division of the Texas Department of Criminal Justice for
sixty years and a fine of $10,000.  For the aggravated sexual assault alleged
in Count III, the jury found appellant guilty and assessed punishment at
confinement for life and a fine of $10,000.  For Count II, the jury found
appellant guilty of the lesser included offense of indecency with a child and assessed
punishment at confinement for twenty years and a fine of $10,000.  The trial
court ordered that the “Count II sentence of 20 years TDCJ-ID runs concurrent”
and the “Count III sentence of Life runs consecutive to Count I sentence of 60
years TDCJ-ID.”  

            Appellant
presents five issues on appeal: the trial court erred in admitting evidence of
an extraneous “bad act”; the evidence was factually insufficient to support the
convictions for the aggravated sexual assaults; the evidence was factually
insufficient to support the conviction for indecency with a child; the trial
court abused its discretion in cumulating the sentence for the indecency
conviction with the sentences for the two aggravated sexual assault
convictions; and the trial court’s sentencing violated the prohibitions in the
United States Constitution and the Texas Constitution against a state applying
an ex post facto law.  We modify the judgment of the trial court to make it
clear that the twenty-year sentence runs concurrent with the Count I sentence
of sixty years.  Otherwise, we affirm.

Background
Facts

            At
the time of trial, T.C. was twenty years old and living in Louisiana.  Appellant
entered T.C.’s life when she was four or five.  Her parents were in the middle
of a bitter divorce.  T.C., her mother, and her brother were living in a
trailer behind a Mexican restaurant near Lake Brownwood.  Her mother and
appellant began a relationship, and appellant moved in with them.  They
subsequently married.

T.C.
testified that she was about eight and one-half years old and in the fourth
grade when appellant first sexually assaulted her.  T.C. stated that the first
sexual assault by appellant occurred when she had stayed home sick.  Appellant
was wearing a robe and asked her to sit beside him on the couch.  He asked her
to feel his penis, and she did.  Appellant then took her to his bedroom and had
her undress.  T.C. testified, “[H]e put himself into me for a few minutes.  I
don’t know how long.”  She told him that it hurt, and he stopped.  He then told
her, “Don’t tell Mom.”  T.C. stated that she did not tell her mother because
she did not think that her mother would believe her and because she was afraid
of appellant.

            During
a sleepover when T.C. was in the fifth grade, she told one of her close friends
about the sexual encounter with appellant.  T.C. and that friend were
subsequently with another close friend, having a deep discussion late at night,
when T.C. also told that friend.  T.C. insisted to both girls that they must
not tell anyone because she did not want to tear her family apart.  Neither
girl ever told anyone, but both testified at trial about those discussions.  At
trial, the two friends were in their twenties, and one was married.

            T.C.
testified that appellant emotionally and mentally abused her and her brother. 
She described appellant as a “true Marine” who would harshly discipline them. 
For example, she remembered appellant requiring her brother to hold a rifle out
in “dead zombie time” and requiring them to clean the bathroom with a
toothbrush.  T.C. also stated that they moved around Brownwood a lot when she
was young; however, she remembered where they were living when the assaults
occurred.

            When
T.C. was thirteen years old and in the seventh grade, the second sexual assault
occurred.  They were living in a rented house on Avenue E in Brownwood at the
time.  T.C. testified that she was staying home because she was sick.  She
remembered that it was in February or March because the weather was cold.  T.C.
said she was asleep when she heard something at the door.  Appellant came in,
lifted up her shirt, and started kissing her breasts.  He then asked her to go
into his bedroom, get undressed, and get on the bed.  She did, and she remembered
that he was wearing boxer shorts, which he took off.  Appellant “put himself
into [her] like the time before.”  When he finished, he told her to take a
shower and clean herself “real good.”  While she was in the shower, appellant
asked her if she was taking birth control pills.  T.C. told him that she was. 
She explained to the jury that she was taking the pills because she was having
problems with her menstrual cycle at the time and her doctor had prescribed
them.  During her testimony, she confirmed that her sexual organ had been
penetrated by appellant’s penis during both assaults.

            The
last incident occurred the following summer when she was still thirteen years
old. She had just had her hair highlighted for the first time.  Appellant had
told her not to have her hair colored.  When she came home, she showed him her
hair.  She stated, “And the next thing I remember, I was standing in his
bedroom and he told me to feel [his penis].  And [she] did.”  However, he did
not penetrate her that time.  It was the last sexual contact she had with
appellant.

            T.C.
testified that she did not tell anyone after the last two occasions.  She
remembered that it was in December in her ninth grade year when she learned that
her uncle and his wife were going to move to San Diego.  She planned to ask
them to take her because she did not want to continue living with appellant and
her mother.  She told a few friends that she was going to ask her uncle, and they
asked her why she wanted to leave.  One of her friends asked her in class, and T.C.
wrote a note telling her about the actions of appellant.  Although T.C. asked
the friends to not tell anyone, they took the note to Reca Godfrey, the school counselor,
who called T.C. to her office.  T.C. told Godfrey what had happened on the
three occasions, and Godfrey called T.C.’s mother.  After her mother came to
the school and visited with T.C. and Godfrey, her mother took T.C. home where
they called a local police officer they knew, Troy Carroll, who came to their
home to begin the police investigation.  Officer Carroll turned the
investigation over to Detective Richard Williams of the Brownwood Police
Department.  T.C. and her mother also contacted Child Protective Services.

Detective
Williams’s testimony essentially reiterated T.C.’s trial testimony.  He had
asked T.C. if there had been any moisture or blood after the assaults.  He
first testified that he remembered T.C. stating that she had not noticed any
moisture or blood. However, after reviewing his notes during the trial, Detective
Williams subsequently corrected his testimony and said that he had written “there
was a little blood” in the margin of his report; he had not noted to which
sexual assault his note related.  Detective Williams also testified that he had
asked T.C.’s mother if she had noted any changes in T.C. about the time of the
first sexual assault.  She responded that she had noticed changes in T.C.  Detective
Williams discussed his interview with Dana O’Connor of Child Protective Services
and T.C.’s written report to O’Connor that described the assaults.

            A
few weeks after meeting with Detective Williams, T.C. and her mother went to
San Angelo where T.C. underwent a sexual assault exam.  The sexual assault
nurse, Angela Wilke, testified that her examination of T.C. revealed a
well-healed “notch” on T.C.’s hymen. The nurse testified that the trauma to T.C.’s
hymen that she found was unusual because T.C.’s hymen had been permanently
separated by a penetration that left a permanent cleft in T.C.’s hymen after it
healed.  Wilke stated that trauma to the hymen was unusual even in assault cases.
She further testified that the level of injury was consistent with an adult
male sexual organ penetrating the female sexual organ of a child.

            Witnesses
for the State included T.C., T.C.’s mother, Godfrey, Officer Carroll, Detective Williams,
Wilke, and T.C.’s two close friends from the fifth grade who have remained
close friends even though they and T.C. live in different states.

            In
defense, appellant testified and called nine witnesses.  Appellant had delayed
the cross-examination of T.C. until he put on his defense and called T.C. as a
witness.  T.C. admitted that the family was in turmoil when her mother divorced
her natural father and appellant first moved in with T.C.’s mother, T.C., and T.C.’s
brother.  She admitted that those were difficult times because her natural
father and appellant did not get along.  She admitted that her natural father
wanted custody of her and her brother, but she testified that he did not ask
her to say anything that might help him in the custody fight.

            Carolyn
Peoples, appellant’s mother, testified that appellant had never had an unusual
sexual interest in children, that she had never known appellant to be cruel
toward children, and that T.C. had not appeared to her to be afraid of appellant. 
She admitted that appellant had been raised by his father to be a strict
disciplinarian.  She also admitted that she was not around T.C. or the family very
often.  She saw them about once a year.

Shane
Horton, appellant’s brother, testified that he did not know T.C. very well and
had not spent much time with T.C.  He also said that he had never known
appellant to have an unnatural sexual interest in children and that appellant
always told the truth.  He acknowledged that his brother believed in
discipline.  He had seen appellant make T.C. and her brother clean the bathroom
with a toothbrush.  Shane admitted that he was not around when any of the alleged
assaults happened.  He did testify that he saw T.C. exhibit friendly behavior
with appellant at a carnival when appellant gave T.C. and her half sister money
for rides.  Shane thought that that was unusual in light of T.C.’s accusations.[1]


            The
remainder of the defense witnesses either had not known appellant until after T.C.’s
outcry to Godfrey and the ensuing investigation or were not around appellant
very often when he was married to T.C.’s mother.  Jenny Strickland, a friend in
Brownwood, and Arthur Rodriguez, a pastor in Crane, Texas, testified that they
did not believe appellant had an unnatural sexual interest in children, that he
was not cruel to children, and that his reputation for telling the truth was
good.  But they did not meet appellant until after T.C.’s allegations became
public.

            By
the time of trial, appellant had remarried and lived in Crane.  His wife,
Suzanne Horton, and her two daughters testified on behalf of appellant.  They
said that appellant treated them well and that they were never uncomfortable
around him.  They also testified that they had not observed appellant to have
an unnatural sexual interest in children and that he had a good relationship
with his other daughter who was T.C.’s half sister, a child of appellant and T.C.’s
mother.

            James
Cleveland, a longtime friend of appellant, testified that appellant did not
have an unnatural interest in children and that appellant had never lied to
him.  He admitted that he had only seen appellant three or four times a year during
the ten years that appellant was married to T.C.’s mother.  Cleveland thought
that T.C.’s mother was appellant’s first wife; she was appellant’s second wife.

            Appellant
testified that none of the alleged sexual assaults had occurred.  He admitted
that he and T.C. did not agree on a lot of subjects.  According to him, T.C.
would wear “the skimpiest shorts [he] had ever seen.”  He claimed he was never
alone with T.C. because he was always on the road as a truck driver.  He
testified that, every time T.C. became sick, she would stay with her
grandmother.  He also testified that, while on one road trip, he had called T.C.’s
mother and that he had called for four hours before finally talking with her. 
According to appellant, her explanation was that she had gone to the store.  He
was certain that she was cheating on him.  He strongly claimed that he was
always faithful to T.C.’s mother and never wanted to cheat on her.  He
expressly denied ever being in a game room in Comanche and said he did not know
a woman named Cathy Hale.

            In
rebuttal, the State put into question appellant’s claim and that of his witnesses
that he was always truthful.  The State pointed out that appellant had proposed
to Suzanne in February 2006.  Suzanne testified that he told her that he was
divorced; that was not true.  He was divorced in June 2006.  T.C.’s
grandmother, who worked for the Early school district for thirty-five years,
testified that appellant was the one alone with the children when they were
sick.  She also testified that T.C. and her brother, when visiting, would ask
to stay because they did not want to go home to stay with appellant.  She further
testified that, at times, appellant did not have a job and that he would be
home with T.C. or her brother.  She asserted that T.C. was very truthful and
that this entire experience had been very hard for T.C. According to the
grandmother, T.C. at first was comfortable around appellant, but when she was
around nine, she began to express a desire to not be around appellant.

            The
jury no doubt remembered T.C.’s mother’s testimony during the State’s case. 
She testified that she had seen appellant emotionally and mentally abuse T.C.
and enforce unusual punishments.  Her parents had seen the abuse.  She admitted
that neither she nor her parents had done anything about the emotional and
mental abuse.  She also testified that, when T.C. was sick and appellant was
not working, he would stay with T.C.

            The
State next called Cathy Hale as a witness to refute appellant’s claims of
truthfulness and fidelity.  Hale worked at the courthouse and recognized
appellant during the trial.  She testified that, in 1998 and 1999, she was
going through a divorce, was vulnerable, and spent time playing games in the
game room in Comanche.  According to her, appellant would stand by her machine
and flirt and finally began propositioning her.  She turned him down, but later
saw him and his brother while working at Mid-Tex Cellular.  By that time, Hale
had remarried.

            After
closing arguments, the jury deliberated for slightly over four hours and then
returned its verdict.

Sufficiency
of the Evidence

            In appellant’s
second and third issues, he argues that the evidence was factually insufficient
to support his convictions for the two aggravated sexual assaults and for the
offense of indecency with a child.  Appellant’s brief was written before the
Court of Criminal Appeals issued its opinion in Brooks v. State, 323
S.W.3d 893, 912 (Tex. Crim. App. 2010).  It is now clear that we review a
sufficiency of the evidence issue, regardless of whether it is denominated as a
legal or a factual sufficiency claim, under the standard set forth in Jackson
v. Virginia, 443 U.S. 307 (1979).  Brooks, 323 S.W.3d at 912; Polk
v. State, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref’d). 
Under the Jackson standard, we examine all of the evidence in the light
most favorable to the verdict and determine whether, based on that evidence and
any reasonable inferences from it, any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt.  Jackson,
443 U.S. at 319; Isassi v. State, 330 S.W.3d 633, 638 (Tex. Crim. App.
2010).  

            Under
the Jackson standard, all evidence, including circumstantial evidence,
is considered.  Nguyen v. State, 54 S.W.3d 49, 52 (Tex. App.—Texarkana
2001, pet. ref’d).  Circumstantial evidence is as probative as direct evidence
in establishing the guilt of an actor, and circumstantial evidence can be
sufficient to establish guilt.  Hooper v. State, 214 S.W.3d 9, 13 (Tex.
Crim. App. 2007).  

            T.C.’s
testimony describing the three sexual assaults was supported by her outcry
statements to Godfrey, the testimony of the SANE nurse who confirmed the outcry
statements and explained the results of the sexual assault examination (the
damage to T.C.’s hymen), T.C.’s written report to Child Protective Services (as
related by Detective Williams), the testimony of her mother, and the testimony
of her two friends that she told in the fifth grade about the first sexual
assault when T.C. was eight and one-half years old.     

            Godfrey
was T.C.’s counselor from the time T.C. was in the third grade until she
graduated from high school.  Godfrey testified that she had a master’s degree
in counseling and was a licensed professional counselor.  When Godfrey called T.C.
into her office about the note, she asked T.C. if her statements in the note were
true.  T.C. told her that they were.  T.C. testified that she began crying and
shaking because she had finally told an adult.  She had not wanted any adult to
know because she did not want her mother to go through another divorce. Godfrey
described T.C.’s initial outcry:

I said, “[T.C.], I
understand you have something you need to tell me.”  And when I told her – I
mean, when I said that to her, she immediately just broke down, started crying,
and told me that, yes, that she had been raped by her step-dad.

 

            And she
began to tell me some of the details about how many times it happened and she
told me that [the] reason he said that he wanted to do this to her was because
she would be having sex some day and he wanted her to know what it felt like,
he wanted to be the one to teach her how to do that.

            

            I talked
to her about running away, why was she going to run away, what she needed to
do.  She said, “He told me that he was going to come back when I was 16 and do
it again” and she was real scared for that reason.

 

            Godfrey
described T.C. as crying uncontrollably and shaking.  T.C. was holding her head
down, but Godfrey finally got T.C. to look at her and describe what had
happened, which was that she had been penetrated twice.  T.C. told Godfrey that
she had told two close friends in middle school about the first time appellant
had assaulted her.  T.C. did not want to tell her mother, but agreed that she
had to.  T.C. was afraid about what would happen to her family, especially her
mother and grandmother.  T.C. thought that they might think less of her.  Godfrey
then called T.C.’s mother to come to the school.

            The
State introduced T.C.’s attendance records through Godfrey.  For the year when T.C.
turned thirteen, the records reflected that she was absent on February 5.  The
records also reflected that T.C. was absent only four times that school year.  Godfrey
agreed that any day T.C. missed would be memorable to T.C. because she missed
so few days.  For the following year, T.C. was absent only three days.

            T.C.’s
mother testified that, after T.C. and Godfrey told her about the assaults, she
took T.C. out of school and contacted an officer they knew, Officer Carroll,
with the Brownwood Police Department.  She testified that she and T.C. packed
everything up and moved out the next day.  Two days after T.C. graduated from
high school, she and the children (T.C., T.C.’s brother, and their half sister)
moved to Louisiana.  Although not detailed here, her testimony also added
credence to T.C.’s testimony.

            M.B.H.
and A.M. were the friends in the fifth grade that T.C. told about appellant’s
sexual assault when she was in the fourth grade.  They related T.C.’s
description of the encounter.  Both would tell T.C. that they needed to tell
someone, but T.C. adamantly refused to allow anyone else to know.  A.M. said
that T.C. was concerned that it might tear the family apart.

            After
examining all of the evidence in the light most favorable to the verdicts, we
find that a rational trier of fact could have found the essential elements of
the three offenses beyond a reasonable doubt.  Appellants second and third
issues are overruled.

Appellant’s
First Issue

            In
appellant’s first issue, he argues that the trial court erred in admitting
evidence of the “bad act” of appellant propositioning Hale while he was married
to T.C.’s mother.  Appellant reasons that the act was irrelevant for any
purpose except to show his propensity to commit other bad acts.  We disagree. 
The evidence was admitted solely for impeachment and to rebut appellant’s
evidence that he always told the truth.

            Appellant’s
witnesses had emphasized in their testimony that appellant always told the
truth.  Appellant’s defense was that T.C. had made everything up and she was
lying.  During appellant’s direct testimony, he was asked if there was an event
that was making T.C. unhappy enough to want to go to San Diego.  Appellant testified
that he and T.C.’s mother argued because she was cheating on him.  He related
one specific instance where he had called T.C.’s mother for four hours while he
and his lead driver were on a job.  When he finally spoke to her, she said that
she had been at the store.  He then testified as follows:

            A.  . .
. Well, that went on several times.  And that is what made me think that she
was cheating on me.  And come to find out later, she was.

 

            Q.  All
right.  And were you being unfaithful to her, too?

 

            A.  No,
sir, I didn’t even have a chance to.

 

            Q.  All
right.

 

            A. Or
even wanted to.

 

 Appellant
stated that he and T.C.’s mother would argue about her infidelity and that T.C.
was accurate when she said she would lie awake at night and listen to them
arguing.  Appellant also stated that, when he arrived home on December 3 or 4,
he found that everyone had moved.

Several
times during cross-examination, appellant again strongly denied that he had
ever cheated on T.C.’s mother and that he had not even wanted to cheat. 
Appellant emphasized that he did not have time to ever cheat on his wife
because of his heavy work schedule.  He claimed that he had not gone to bars and
other places to “hit on women” while married to T.C.’s mother.  He testified
that he did not know a woman named Cathy Hale.

            Hale
worked at the Brownwood courthouse and recognized appellant during the trial.  Appellant
objected to the State calling Hale as a witness because she had not been on the
State’s witness list and because the State had not given any notice of bad
acts.  In response, the State argued that Hale was only called as a rebuttal
witness because appellant had called eight witnesses to talk about the
truthfulness of appellant and because appellant’s counsel had elicited
appellant’s testimony that T.C.’s mother was cheating on him and he had never
even wanted to cheat.  Appellant had put on a substantial amount of character
evidence, and the State wanted to rebut that image.

            The
trial court held a hearing outside the presence of the jury where the State
made a proffer of Hale’s testimony.  The State pointed out that appellant’s
theory in defense was that the mother was cheating on him and T.C. had created
the entire story to somehow help her mother. Appellant’s counsel argued that
the marriage was falling apart in December 2003 and that that was “some 17 to
22 months after the last possible event had occurred.  And [the failing
marriage had] to do with the state of mind of this child when the outcry was
made.”  Counsel then argued that any interaction between appellant and Hale was
too remote in time and confused the issue.  The State, in response, stated
again that the testimony would simply be impeachment and that appellant had put
his character in issue.  The State further stated that it had just learned of
this potential witness the previous day.

            If a
trial court determines that evidence of extraneous crimes or bad acts has
relevance aside from character conformity and if a proper Rule 403 objection is
made, the trial court must make a balancing determination under Rule 403.  Tex. R. Evid. 403; Montgomery v.
State, 810 S.W.2d 372, 388–89 (Tex. Crim. App. 1991).  The trial court below
expressly found that the probative value of the proposed testimony outweighed
its prejudicial nature and that it would not confuse the issues.  See Rule 403.  The court instructed the State
to limit its questions for impeachment purposes.  After ruling that the witness
would be allowed to testify “in a limited nature,” the trial court asked
appellant if he wanted any limiting instructions to make it clear that the
testimony was for impeachment purposes only.  Appellant declined the court’s offer.

            We
review a trial court’s decision to admit or exclude evidence under an abuse of
discretion standard.  Oprean v. State, 201 S.W.3d 724, 726 (Tex. Crim.
App. 2006); Burden v. State, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). 
An appellate court will not reverse a trial court’s ruling unless that ruling
falls outside the zone of reasonable disagreement.  Zuliani v. State, 97
S.W.3d 589, 595 (Tex. Crim. App. 2003); Burden, 55 S.W.3d at 615.  We
find that the trial court’s ruling in this case did not fall outside the zone
of reasonable disagreement.  Rule 404(a) provides that evidence of a
person’s character or character trait, although generally not admissible, may
be admitted if it is offered by the accused or by the prosecution to rebut the evidence
offered by an accused.  Tex. R. Evid.
404(a).  

            From
the record, it appears that the defense strategy was to convey an image to the
jury that appellant was hardworking and truthful, that his wife was unfaithful
but he was not, and that T.C. had made up the outcry to help her mother.  The
State was entitled to call Hale as a witness in rebuttal.  Appellant’s first
issue is overruled.

Appellant’s
Fourth and Fifth Issues

            In
appellant’s fourth issue, he contends that the trial court abused its
discretion in cumulating appellant’s sentence for the indecency-with-a-child
conviction with his sentences for the two aggravated sexual assault
convictions.  In his fifth issue, he argues that his sentencing violated the
United States and Texas Constitutions prohibitions against a state applying an
ex post facto law.  

            Appellant
was convicted of three offenses: (1) Count I: an aggravated sexual assault on
or about January 1, 2003; (2) Count II: indecency with a child by sexual
contact on or about July 20, 1997; and (3) Count III: an aggravated sexual
assault on or about July 20, 1998.  

            Appellant’s
argument is based on Tex. Penal Code
Ann. § 3.03(a) (West Supp. 2011), which limits a trial court’s
discretion to cumulate sentences where a defendant has been found guilty of
more than one offense arising out of the same criminal episode in a single
trial.  A criminal episode is defined as including the repeated commission of
the same or similar offenses.  Section 3.01 (West 2011).  Appellant notes
that the legislature in May 1997 amended Section 3.03(a) to add certain
sexual offenses committed against a victim younger than seventeen to the list
of those offenses subject to consecutive sentencing.  See Section
3.03(b)(2)(A) (West Supp. 2011).  The amendment permitted sentences for
indecency with a child and aggravated sexual assault obtained in a single trial
to be consecutive if committed on or after September 1, 1997.  

            In
this case, the act of indecency with a child occurred prior to the effective
date of the 1997 amendment to Section 3.03.  The two aggravated sexual assault
convictions were committed after the effective date.  Appellant contends that
the trial court’s judgment erroneously orders the indecency-with-a-child
sentence to run concurrent with both sentences for aggravated sexual assault
despite the court having ordered the life sentence (Count III) to run
consecutive to the sixty-year sentence (Count I).

            Appellant’s
argument in his fifth issue is that the trial court’s judgment amounted to an
ex post facto law because the effect of the order is to have appellant’s second
sentence run twice, i.e., concurrent with the sentence in Count I and
concurrent with the sentence in Count III that begins after the completion of
the sentence in Count I. 

            The
trial court’s judgment provided the following special orders:

Count II sentence of
20 years TDCJ-ID runs concurrent.

 

Count III sentence
of Life runs consecutive to Count I sentence of 60 years TDCJ-ID.

 

            In
response to both issues, we modify the trial court’s judgment to make it clear
that the twenty-year sentence runs concurrent with the Count I sentence of
sixty years.  

This
Court’s Ruling

            The
judgment of the trial court is modified to read “Count II sentence of 20 years
TDCJ-ID runs concurrent with the Count I sentence of 60 years TDCJ-ID.” 
Otherwise, the judgment of the trial court is affirmed.  

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

February 16, 2012

Do not publish.  See Tex. R. App. P. 47.2(b).

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.









                [1]T.C.’s mother had provided an explanation during the
State’s case.  She testified that T.C. was in counseling at the Child
Protective Center for a year.  T.C. had avoided seeing appellant when he came
to pick up her half sister, but finally she told her mother that she had to
face appellant stating, “Mom, I’m going to have to face my demons one day, and
it might as well be today.”  After that, T.C. did not hide from appellant.